Filed 3/30/21  P. v. Urrutia CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DIEGO GUADALUPE URRUTIA<br><br>    Defendant and Appellant. | B305371<br><br>(Los Angeles County<br>Super. Ct. No. LA083810) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Martin L. Herscovitz, Judge.  Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Appellant challenges his conviction of second degree murder. On appeal, he argues: (1) the trial court failed to instruct the jury sua sponte that a victim's suicide can be an intervening cause of death; (2) the omission of an intervening cause of death instruction permitted the prosecutor to argue an incorrect legal theory; and (3) the trial court's imposition of fines and fees without an ability-to-pay hearing violated his due process rights.

We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In an Information filed February 15, 2019, appellant Diego G. Urrutia was charged with the murder of Daniel Hernandez-Pineda, a violation of Penal Code[1] section 187, subdivision (a), and arson, a violation of section 451, subdivision (c). Appellant entered pleas of not guilty to both counts.

On December 3, 2019, the People moved to dismiss the arson count. The motion was granted. Trial by jury commenced.

A.    Prosecution Evidence

Appellant, his grandmother, his sister Iliana, Iliana's two children, and Iliana's boyfriend Daniel resided in an apartment located on Woodman Avenue. The apartment building had a carport accessible by tenants from an alley on the side of the building.

Appellant and Daniel met each other in high school and had a "good" friendship. According to Iliana, appellant and Daniel "started having problems" when she began dating Daniel.

---

[1]    All further undesignated references are to the Penal Code.

2

By June 2016, Iliana and Daniel had been dating for about four years. Iliana had actually kicked appellant out of their apartment on a previous occasion because of issues between him and Daniel.

On June 30, 2016, Daniel drove Iliana to work; while she worked from 5:00 a.m. until about 2:00 p.m., Daniel slept in the car. After work, they drove home. Appellant asked Iliana and Daniel if either of them could "take him to buy some shoes" and Daniel agreed. The two men left around 3:00 p.m.

Appellant returned to the apartment alone, sometime between 5:00 and 6:00 p.m. He told Iliana Daniel was "outside in the garage." Iliana found Daniel "outside the car, just walking around"; he appeared "drunk" and "smelled like beer." Iliana saw a few open beer cans in the car. The car was backed into the parking spot, with the front of the car facing the alley. Iliana told Daniel to come into the apartment, but he refused.

Rafael Torres, another resident of the apartment building, heard the couple arguing while he was walking in the alley next to the carport. He asked Iliana to "stop yelling" and told Daniel "to calm down and go into his car." According to Torres, Iliana and Daniel "were always outside yelling at each other or he was getting yelled out. And he would spend hours and hours at a time in his car." Iliana was "always . . . berating him, yelling at him." Iliana "would call [Daniel a] homosexual. She would call him a piece of shit. She would say horrible things." Daniel thanked Torres and went to his vehicle.

Daniel sat in the driver's seat and started smoking a pipe of methamphetamine. Iliana testified Daniel's behavior would change when he smoked methamphetamine. He became "nervous" and would say he was depressed and wanted to die.

3

Iliana got angry and threw out the pipe. Daniel then threw something at the front windshield, creating a big crack.

Heraclio Montalvo, a resident of the same apartment building, saw Daniel and Iliana arguing as he arrived home from work. He heard Iliana tell Daniel "he had to leave." He referred to Iliana and Daniel as a couple known to argue "regularly."

Around 7:00 p.m., Maria Arriaga, the resident manager of the apartment building, arrived home to drop off her brother and son. When driving down the alley next to the carport, Arriaga noticed "a couple were arguing." Arriaga's car window was down, enabling her to hear what was being said. She heard Iliana argue with Daniel, "using harsh words" and "cussing at him," telling him: " 'You motherfucker, get out of the car; otherwise, you'll pay for this.' "

After dropping off her brother and son, Arriaga parked her car and walked toward the alley. She told Iliana "to stop fighting with her boyfriend," to which Iliana responded, " 'This son of a bitch is going to pay for this.' " Iliana became "furious" and said if Daniel "didn't get out of the car, she was going to call her brother." Iliana then left and "head[ed] down the alley."

Iliana went into the apartment and informed appellant "what had happened, that Danny didn't want to come in and that he had broken the windshield." She accused appellant of starting fights between her and Daniel; appellant replied with, "I don't give a fuck."

According to Iliana, she returned to the carport, accompanied by appellant. Appellant appeared "furious" and "angry." He yelled at Daniel (sitting in the driver's seat) to "get the fuck out of the car" but Daniel refused. Appellant told Daniel "if he didn't get out of the car, he was going to go get the

4

gasoline." He told Daniel three times, "Get the fuck out of the car before I burn you inside alive." Daniel remained in the car and said he was not going to leave. Appellant said, "Oh, yeah, fool?" and went inside.

After appellant left, Daniel started crying. He told Iliana "about how he wanted to die; that no one cared about him" and that "he didn't want to be here." Iliana tried to open the car doors, but Danny had locked them.

About two minutes later, appellant returned with a plastic container carrying a "liquid that was greenish/yellowish." Appellant "grabbed" Daniel from his neck and chest area, pulled him out of the car, and "slammed him" against the wall of the carport. Daniel was "wobbling" and had blood all over his face.

Appellant next grabbed the plastic container and "doused" Daniel with its liquid content. He then put Daniel in the car and "poured the rest of what was left of the gasoline" on the car. Iliana yelled, "Stop, Diego, stop, don't burn him" and "don't kill him."

Torres heard Daniel screaming "no, no." He saw appellant "throwing liquid on [Daniel] in the car." He then saw "a spark coming from [appellant's] right hand" and ignite the fire. Similarly, Arriaga saw something in appellant's hand with "a light or a glow", and she watched as appellant threw "something" into the car. She did not know whether it was "a lighter or matches."

Iliana testified she saw appellant "pulled out something white," but did not know what. She "only saw that [her] brother had something in his hand." Iliana also saw Daniel "opening the glove compartment" just before the fire started, "but [didn't]

5

know what he was doing, whether he was looking for something."[2]

"Right away, everything got into a fire."  The whole car and Daniel were engulfed in flames.  Torres ran towards the burning car, reached in, grabbed Daniel by the shirt, and pulled him out.

Montalvo, who was crossing the alley, came face to face with Iliana, who "came out crying" and asked for his help.  He went toward the commotion and saw the car on fire inside the carport.  He saw Daniel "rolling near the wall" and "trying to put himself out."  He also saw appellant trying to put out flames on his own forearms and clothes.  He ran to his apartment to bring water.

A moment later, Montalvo returned with a five-gallon container filled with water.  Daniel's clothes had burned off and his hair was on fire.  Montalvo "doused" Daniel's hair with water. Montalvo believed appellant appeared "indifferent" and "not interested."  Iliana said to appellant, "What have you done?"

Appellant's shirt was burned.  He walked away from Arriaga toward the alley.  Arriaga asked appellant whether she should call the police or the paramedics.  Appellant told her, "Don't get involved.  It's not your problem."

Arriaga called 911, requesting paramedics.  She said that "a couple guys" were "fighting", a car is burning, and "somebody's in the car."

---

[2]     Iliana had seen a green and black colored lighter in the car earlier that day.

At 7:09 p.m., firefighters Matthew Jackson, Matthew Corral, and others arrived at the apartment.  Appellant ran out to the firefighters, and told firefighter Corral:  "Hey, I need your help.  Why aren't you helping me out?  I'm burnt."  Firefighter Jackson noticed appellant had burns on his arms.  Firefighter Corral then noticed Daniel down the alley, lying on his back.  Daniel had "severe burns to the majority of his body" and was suffering "agonal respirations"—meaning, a "very hard time breathing."

At 7:12 p.m., the paramedics arrived.  Paramedic Andrew Guzzard described Daniel as "critically burned" and it "appeared as though his entire body had been burnt from head to toe."  Daniel had "partial thickness and full thickness burns", "skin sluffing and char everywhere."[3]  The paramedics tried to pick up the patient, but "it was very hard to do so, because as [they] grabbed his arms, legs, [etc.], the skin was just kind of coming right off with [their] hands."  Daniel was taken by ambulance to Holy Cross Hospital.

According to Robert McLoud, an arson investigator with the Los Angeles Fire Department, even if a lighter in the car had been plastic, the metal components of the top portion would survive a fire.  McLoud did not find anything in the vehicle resembling a lighter or parts of a lighter.  Based on his

---

[3]     "[A] superficial burn would be first degree.  Partial thickness would be . . . second degree.  You'd see blisters, reddening.  And then third degree, or full thickness burns, would be burns that burnt past the first two layers—or first layer of skin, the dermis, down into the subcutaneous tissue and into the muscle, deadening nerve cells, nerves, [etc.]."

7

background, training, and experience, McLoud opined the fire was "intentionally set."

Around 11:00 p.m. that evening, Detective Luis Romero interviewed an "emotional" Iliana, who cried several times during the interview, "constantly asking about how the victim was doing." Iliana told the detective appellant and Daniel "were constantly arguing and fighting over the relationship between her and [Daniel]." She had specifically taken Daniel to her workplace that day "because she didn't want him being alone with" appellant. She also told the detective that right before the fire started, she saw appellant "extend his right arm as he was holding a lighter." She, however, did not tell the detective about Daniel smoking methamphetamine in the car. Nor did she tell him Daniel had cried and said he wanted to die.

Detective Daryn Dupree traveled to Holy Cross Hospital where Daniel and appellant, who had substantial burns on his right and left hands, were being treated. The detective examined Daniel's clothing (only portions of his pants had survived the fire) and did not find any lighter or matches. The detective's partner examined appellant's clothing and found a Bic lighter.

Appellant was arrested.

Daniel died the next day, on July 1, 2016.

On July 5, 2016, forensic pathologist David Whiteman autopsied Daniel. Based on his background, training, experience, and examination of the body, he opined Daniel's cause of death to be "from both smoke inhalation and thermal injuries" and manner of death "to be homicide." He also observed a series of scars across Daniel's left forearm—"older cuts that were healed." He opined the cuts were "a marker of depression or some other

8

problems about the adolescent." Whiteman ruled out self-immolation as a cause of death.

B.  Defense Evidence

Toxicologist John Treuting found amphetamine in Daniel's blood, which meant Daniel's liver had metabolized the methamphetamine he had ingested to amphetamine. Treuting explained methamphetamine is a "central nervous system stimulant drug" that causes the individual to "feel superman-like" and "hyperalert"; their inhibitions get lower and there is "increased risk-taking phenomena." The individual could become "very anxious" or "paranoid." Trueting testified the amount of methamphetamine and amphetamine in Daniel's body indicated he would have experienced a "significant disruption in normal brain function." He could not rule out suicide.

Dr. Odey Ukpo, a deputy medical examiner with the Los Angeles County Coroner's Officer, reviewed the toxicology report, autopsy report, and coroner's file. Based on his review, Dr. Ukpo opined Daniel's cause of death was thermal injuries. He also opined the manner of death is "undetermined"—he considered it "a 50/50 chance" that it was either homicide or suicide. He considered "suicide as a possible manner of death" based, in part, on the fact that Daniel had scars of previously inflicted incise wounds on his wrist; "these wounds are what you see in someone trying to commit suicide." Dr. Ukpo noted that individuals with a history of taking methamphetamine also have "a history of depression."

C.  Verdict and Sentencing

At trial, the People argued the evidence showed appellant lit the fire after threatening Daniel and dousing him and the car with gasoline. Alternatively, the People argued appellant was

9

guilty because Daniel's death was the natural and probable consequence of dousing him with gasoline and then lighting an open flame.  In contrast, the defense argued that while appellant poured the gasoline, it was Daniel who lit the fire causing his own death.  The defense argued appellant committed battery by pouring gasoline on Daniel with criminal negligence, but that Daniel's death was the suicide of "a young man [who] was traumatized and depressed."

On December 12, 2019, a jury found appellant not guilty of first degree murder and guilty of second degree murder.

On February 26, 2020, appellant was sentenced to a term of 15 years to life.  The court imposed a $40 court security fee per section 1465.8, subdivision (a)(1), a $30 criminal conviction assessment per Government Code section 70373, a $300 restitution fine per section 1202.4, subdivision (b), and a $300 parole restitution fine per section 1202.45, which was stayed.

Appellant timely appealed.

## DISCUSSION

Appellant contends the trial court's instructions to the jury were correct but inadequate in two respects.  First, he argues the instructions failed to address "the causal relationship necessary to impose murder liability on a defendant when the victim commits suicide."  While "there was no meaningful conflict in the evidence" as to whether appellant poured gasoline on Daniel, "the evidence *was* in dispute [as to] whether [appellant] ignited the gasoline or whether [Daniel] did."  He argues the dispute as to whether appellant or Daniel lit the fire "raised the question whether [appellant]'s act of dousing [Daniel] with gasoline was itself a sufficient legal cause of death."

10

Second, appellant argues the trial court erred by failing to instruct the jurors on the principle of independent intervening cause, as Daniel's alleged suicide could constitute an independent intervening cause absolving appellant of criminal liability.

A.  Relevant Proceedings

On December 10, 2019, the trial court indicated to appellant and counsel it would instruct with CALCRIM No. 620 as edited, and stated: "I'm going to give 620 the way I have it written. There's no question that the defendant had to have killed the victim in order to be guilty." The court also noted it did not "think we're bound by the coroners distinguishing between manner of death and cause of death." Appellant did not state an objection to CALCRIM No. 620 on that date. The next day, on December 11, 2019, the trial court specifically asked both counsel if there are "any objections to the instructions that are given this morning in their final state", to which both counsel (including appellant's) replied, "No."

The trial court gave the following jury instructions:

CALCRIM No. 620: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if Daniel . . . would have died in a short time as a result of other causes. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

11

CALCRIM No. 520: "To prove that the defendant is guilty of [murder], the People must prove that: One, the defendant committed an act that caused death of another person; and two, when the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, expressed malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant has express malice if he unlawfully intended to kill. The defendant had implied malice if: One, he intentionally committed the act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and four, he deliberately acted with a conscious disregard for human life. [¶] . . . [¶] An act causes death if the death is a direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen *if nothing unusual intervenes*. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] If you decide that the defendant committed murder, it is murder of the second degree unless the people have proved beyond a reasonable doubt that it is murder of the first degree . . . ." (Italics added.)

During closing argument, the prosecutor argued if a juror "think[s] . . . at that very . . . same time the defendant comes back after making the threats, comes back with the gasoline and at that, very time, *the victim lit himself, the defendant is still liable for murder. [¶] And you're going to have jury instruction 620 because in dousing the victim with gasoline, basically, the defendant is creating a situation for the victim to kill himself and*

12

*he's not allowed to do that.* It reads, 'If the defendant's act of dousing the victim with gasoline is a substantial factor for causing death, then the defendant is legally responsible.' " (Italics added.)

Near the end of closing, the prosecutor maintained appellant had both express and implied malice. As to implied malice, he posited to the jury: "[I]f for some reason you don't think [appellant] knew that dousing someone with gasoline and then using an open flame that he didn't intend to kill, well, of course the natural and probable consequences of such an act is dangerous to human life. So implied malice is there as well. That's second degree murder."

B.      Standard of Review

De novo review applies to whether the trial court has a sua sponte duty to give a particular instruction. (*People v. Simon* (2016) 1 Cal.5th 98, 133; *People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

C.      Applicable Law

In criminal cases, a trial court has a duty to instruct on general principles of law relevant to the issues raised by the evidence, that are closely and openly connected to the facts, and that are necessary for the jury's understanding of the case. (*People v. Anderson* (2011) 51 Cal.4th 989, 996; *People v. Carter* (2003) 30 Cal.4th 1166, 1219; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) In other words, there must be substantial evidence to support giving a particular instruction. (*People v. Crew* (2003) 31 Cal.4th 822, 835; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1049.) Indeed, a trial court "may properly refuse an instruction offered by the defendant . . . if it is not supported

by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30; see generally, *People v. Marshall* (1997) 15 Cal.4th 1, 39–40.)

D.     Waiver

First, the People assert appellant waived any claim of instructional error because he did not object to CALCRIM No. 620 or request modification to address what appellant alleges are issues affecting proximate and intervening cause. (Cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 669 [defendant forfeited any instructional error by not objecting below and instead approving modified instruction]; (*People v. Lee* (2011) 51 Cal.4th 620, 638 [failure to request clarification of an otherwise correct instruction forfeits claim of error].) Appellant does not deny this, but argues "the claim is statutorily preserved" via section 1259.

We need not address section 1259 because our review of the record reveals the following exchange between the trial court and appellant. Though appellant did not object to CALCRIM No. 620 per se, appellant did object and raise the issue of instructing on the effect of "who lit the flame" in response to the court's second degree murder instructions. When the trial court asked appellant why it should not give the second degree murder instruction, defense counsel replied: "I think there can be a confusion on the part of the jury if they find that pouring gasoline on someone in [and] of itself, even if [appellant] isn't the one who lit the fire, is enough to substantiate the second degree murder charge." The court explained that the jury "can find that's implied malice. If I pour gasoline all over somebody and they happen to be sitting next to a hot water heater or something, it sounds like implied malice to me." Following this, appellant stated it was "just to note [his] objection for the record." We

14

conclude appellant did not forfeit his claim of instructional error and proceed to address the merits of his arguments.

1. *The Evidence Did Not Impose an Obligation on the Trial Court to Instruct the Jury Sua Sponte on Intervening and Proximate Cause*

Appellant argues the trial court erred in failing to instruct the jury, sua sponte, that if Daniel ignited the fire, appellant was not the proximate cause of Daniel's death and the suicide attempt was an intervening cause of his death. Preliminarily we note appellant acknowledges, and we agree, the instructions as given by the trial court correctly stated the law. He also acknowledges he never proposed specific modified or additional instructions for the trial court's consideration. Nevertheless, appellant argues the trial court, sua sponte, should have given more specific instructions explaining the concepts of proximate causation and intervening cause of death as those concepts relate to a victim's suicide. Appellant argues more detailed instructions were necessary because some jurors might have decided that appellant's dousing gasoline on Daniel, without more, was sufficient to impose murder liability on appellant.

We reject defendant's argument that the trial court was required to further instruct sua sponte on the issues of proximate cause or intervening cause as they relate to suicide, to wit, if Daniel lit the flame, appellant was not guilty of murder. Our review of the record shows the evidence of suicide is insufficient to trigger such an obligation. (See *People v. Maury* (2003) 30 Cal.4th 342, 424.)

15

Arriaga testified she heard Iliana yell, "Stop, Diego, stop, don't burn him" and "don't kill him." She testified she had seen something in appellant's hand with "a light or a glow", and then watched appellant throw "something" into the car—but did not know whether it was "a lighter or matches." Torres testified he saw appellant "throwing liquid on [Daniel] in the car." He then saw "a spark coming from [appellant's] right hand" and ignite the fire. Iliana saw appellant "pulled out something white," but did not know what. She "only saw that [her] brother had something in his hand." Iliana had told Detective Romero that right before the fire started, she saw appellant "extend his right arm as he was holding a lighter. Torres testified he heard Daniel scream, "no, no" when appellant was dousing him and the car with gasoline. The arson investigator found no evidence of a lighter in the burnt car or in Daniel's clothes.

In contrast, the only evidence circumstantially supporting the possibility that Daniel caused the fire himself is Iliana's testimony that she saw Daniel "opening the glove compartment" just before the fire started, "but [didn't] know what he was doing, whether he was looking for something." However, this testimony suggests only that Daniel may have been looking for something; it suggests nothing more. Iliana also testified that after appellant threatened Daniel and left the garage, Daniel had cried and said he wanted to die, statements he had often made in the past when he smoked methamphetamine. Iliana did not, however, testify that Daniel had previously attempted suicide, a significant evidentiary gap given the couple had been dating for four years at the time of Daniel's death. Neither do the old cutting scars on Daniel's wrist support an inference that he was actually suicidal on the day of the fire. We conclude this

16

circumstantial evidence is too tenuous, stale, and speculative to impose upon the trial court a further obligation to instruct the jury sua sponte on suicide as an intervening or proximate cause of Daniel's death. As a result, we see no need to discuss the case authorities appellant cites to distinguish between suicides that break the chain of causation and suicides that do not.

2. *Appellant's Failure to Object During Closing Argument Forfeited His Claim that the People Misstated the Law.*

Notwithstanding his concession that the instructions as given were "correct in themselves," appellant contends the trial court's instructional omissions "set the stage for the prosecutor to present a legally invalid theory of proximate causation to the jury", to wit, that appellant was guilty of murder if he created a situation that facilitated Daniel's suicide.

Given the lack of substantial evidence of a suicidal act by Daniel, we reject this argument. Moreover, appellant's failure to object to the prosecutor's argument forfeits this claim. (*People v. Centeno* (2014) 60 Cal.4th 659, 674 [generally, a " ' "defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety" ' "].)

3. *Appellant Forfeited His Claim that He Was Entitled to an Ability-to-Pay Hearing as to the Imposition of Fees, Fines, and Assessments.*

Appellant argues the trial court violated his federal and state right to due process of law by imposing a $40 court security fee per section 1465.8, subdivision (a)(1), a $30 criminal conviction assessment per Government Code section 70373, and a

17

$300 restitution fine per section 1202.4, subdivision (b), without determining whether he had the present ability to pay.[4] Appellant requests we vacate the assessments and stay the imposition of the restitution fine under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*).

The trial court sentenced appellant on February 26, 2020, more than 13 months after the decision in *Duenas* and more than five months after the decision in *Aviles*. Despite this, appellant did not object to the fees, assessments, or the restitution fine imposed. We find his challenge forfeited and we decline to exercise our discretion to adjudicate this forfeited issue. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117–118.)

Appellant argues if his claim was forfeited, his trial counsel rendered ineffective assistance by not objecting. We disagree. Ineffective assistance of counsel may be shown on direct appeal where counsel's performance falls below an objective standard of reasonableness. (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.) The fines and fees total $370. Appellant bore the burden of establishing that he would not be able to pay that amount over the following 15 years in custody. His sole argument in support of ineffective assistance is that he "gained no benefit from counsel's omission" and that there was "no conceivable tactical basis for omitting objection to imposition to fines without a hearing on [his] ability to pay." Appellant fails to explain his argument beyond the conclusory statement quoted above. Appellant has not shown that his counsel's failure to ask

---

[4]  On appeal, appellant does not challenge the $300 parole restitution fine per section 1202.45, which was stayed.

for an ability-to-pay hearing fell below an objective standard of reasonableness.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:


BIGELOW, P. J.


GRIMES, J.